## Mackay v. Easton.

1. On the 16th of November, 1815, one J Smith was the owner of two arpents of land, in the village of Little Prairie, in the county of New Madrid, in the State of Missouri, which had been confirmed to him by the commissioners appointed under the act of Congress of March 2d, 1805, " to ascertain and adjust the titles and claims to land, in the Territory of Orleans, and District of Louisiana," out of which region the State of Missouri was carved. The certificate of confirmation was numbered 1116. The village of Little Prairie was nearly destroyed by earthquakes in 1811 and 1812, and the two arpents being thus materially injured, the recorder of land titles, at St. Louis, on the 16th of November, 1815, under the act of Congress of February 17th, 1815, upon proof of the injury, gave to J. Smith a certificate to that effect; and *that he or his legal representatives* were entitled, under the said act of Congress, to locate any quantity of land, not exceeding one hundred and sixty acres, on any of the public lands of the Territory of Missouri, *the sale of which was authorized by law.* On the 22d of October, 1816, one *James Smith* (blacksmith), and Sarah, his wife, describing themselves as of the county of Cape Girardeau, executed a deed to one Rufus Easton, in terms conveying the two arpents (aptly describing them), and stating that they had been confirmed to him by the commissioners for the adjustment of land titles in the Territory, by the name of J. Smith, and were known on their books as claim and certificate number 1116; and that the land had been materially injured by earthquakes. The deed also conveyed to Easton, the right to locate other lands in lieu of those injured, under the act of Congress, and the lands which might be thus located. The deed was acknowledged before a judge of the Circuit Court of the Territory on the day of its date, and was on the following month recorded in New Madrid County. Under the certificate thus issued, a location was made on the application of Easton, and in March, 1818, the tract located was surveyed by the deputy surveyor-general of the Territory, and on the 23d of February, 1823, the survey was returned to the recorder of land titles. Easton conveyed his interest to one William Russell prior to 1827, and on the 27th of May, of that year, a patent of the United States was issued, granting the tract thus located and surveyed, to J. Smith, or his legal representatives. This patent was transmitted to Russell, and he afterwards conveyed his interest in the land to the defendant. More than fifty years after the date of the conveyance to Easton, by James Smith and wife, an instrument, dated March 5th, 1819, purporting to be a conveyance of the two arpents of land in Little Prairie, signed by J. Smith with his mark, and describing himself as *lately* of that village, was produced and placed on record. In an action of ejectment, in which the plaintiff traced his title through the recently discovered instrument, the defendant offered the deed of James Smith,

in 1816, to Easton, through whom he traced his title; and it was admitted in evidence against the objection, that "it could not be presumed that a deed from James Smith, blacksmith, of Cape Girardeau, was a deed from J. Smith, of New Madrid." *Held,* That the court below ruled correctly in admitting the deed; and that the fact, that the grantor described himself at the time as of Cape Girardeau, after Little Prairie had been abandoned, was an immaterial circumstance, his identity with the original owner of the land being stated in the body of the deed.

2. The reports of cases in Howard's Supreme Court Reports may be referred to as expositions of law upon the facts there disclosed, but they are not evidence of those facts in other cases. The decisions in *Easton* v. *Salisbury,* in the 21st of Howard, in *Stoddard* v. *Chambers,* in the 2d of Howard, and in *Mills* v. *Stoddard,* in the 8th of Howard, commented upon and distinguished from the case at bar.

3. The act of Congress of February 17th, 1815, for the relief of the inhabitants of the county of New Madrid, Missouri, who had suffered by earthquakes, contemplated that the title of the owners of the land injured in that county should pass to the United States, at the same time that the title to the land located in lieu thereof passed to the claimant, or rather the right to the title, for the strict legal title did not pass until the patent issued; and that this exchange of titles should take place when the claimant obtained his patent certificate, or the right to such certificate, which he could not acquire until the plat of the survey was returned to the recorder of land titles. Until the plat was placed in the public depository in the Territory, of evidences of title issuing from the United States, there was no official recognition of the proceedings taken by the claimant, for the location of his New Madrid certificate, which bound the government.

4. The act of April 26th, 1822, "to perfect certain locations and sales of public lands in Missouri," refers in its first section to actual locations made by the deputy surveyor at the request of the claimant, and not to the perfected locations which appropriate the land on the return of the plat of the survey to the recorder of land titles. It cured any defects in such actual locations prior to its passage, arising from their being made upon lands which had not been surveyed by the government, or if surveyed, from want of conformity in the locations to the sectional and quarter-sectional lines of the surveys.

ERROR to the Circuit Court for the Eastern District of Missouri:

George Mackay brought ejectment against Alton Easton for the possession of one hundred and sixty acres of land in the city of St. Louis, State of Missouri. Both parties traced their title to the demanded premises through one J. Smith, who asserted a claim to two arpents of land in the village of

Little Prairie, in the district, now county, of New Madrid, in that State, by virtue of his settlement thereon under permission from the Spanish authorities, previous to the year 1800, and his inhabitation and cultivation of the same prior to and on the 20th of December, 1803. His claim was recognized as valid, and on the 9th of July, 1811, was confirmed by the commissioners appointed under the act of Congress of March 2, 1805, to ascertain and adjust the titles and claims to land in the Territory of Orleans and the District of Louisiana,* who decided that he was entitled, under the provisions of the act, to a patent for the two arpents. The commissioners' certificate of this confirmation is numbered 1116.

In the years 1811 and 1812 a large part of the land in the county of New Madrid was injured by earthquakes; and on the 17th of February, 1815, Congress passed an act for the relief of parties who had suffered in this way.† By this act any person owning land in the county which had been materially injured was authorized to locate a like quantity of land on any of the public lands of the Territory of Missouri, *the sale of which was authorized by law.* And whenever it appeared to the recorder of land titles for the Territory, by the oath or affirmation of a competent witness, or witnesses, that any person was entitled to a tract of land under the provisions of the act, it was his duty to issue to such person a certificate to that effect. Upon this certificate, on the application of the claimant, a *location* of the land was to be made by the principal deputy surveyor for the Territory, or under his direction, who was required to have the location surveyed, and a plat of the survey returned to the recorder, with a notice designating the tract and the name of the claimant.

The act also provided for the transmission by the recorder to the Commissioner of the General Land Office of a report of the claims allowed, and locations made, and for the delivery to the claimant of a certificate of his claim and loca-

---

* 2 Statutes at Large, 324.            † 3 Id. 211.

tion, which would entitle him, on being forwarded to the commissioner, to a patent of the United States. The act declared that in all cases when the location was made under its provisions the title of the claimant to the injured lands should revert to, and vest in, the United States.

The two arpents of land in New Madrid claimed by J. Smith and confirmed to him were injured by earthquakes, and upon proof of the fact the recorder of land titles at St. Louis, on the 16th of November, 1815, gave him a certificate to that effect, and that he or his legal representatives were entitled, under the act of Congress, to locate any quantity of land, not exceeding 160 acres, on any of the public lands of the Territory of Missouri, the sale of which was authorized by law. This certificate was numbered 159.

Afterwards, on the 22d of October, 1816, one James Smith (blacksmith), and Sarah, his wife, describing themselves as of the county of Cape Girardeau, executed a deed to Rufus Easton, in terms conveying the two arpents, aptly describing them, and stating that they had been confirmed to him by the commisioners for the adjustment of land titles in the Territory, by the name of J. Smith, and were known on their books as claim and certificate number 1116; and that the land had been materially injured by earthquakes. The deed also conveyed to the said Rufus Easton the right to locate other lands in lieu of those injured, under the act of Congress, and the lands which might be thus located. This deed was acknowledged before a judge of the Circuit Court of the Territory on the day of its date, and was on the following month recorded in New Madrid County. It was produced and given in evidence subject to the objection hereinafter mentioned.

Under the certificate thus issued a location was made on the application of Rufus Easton, and in March, 1818, the tract located was surveyed by the deputy surveyor-general of the Territory, and on the 23d of February, 1823, the survey was returned to the recorder of land titles. This survey was numbered 2491.

Rufus Easton conveyed his interest to William Russell

prior to 1827, and on the 27th of May of that year a patent
of the United States was issued, granting the tract thus lo-
cated and surveyed to J. Smith, or his legal representatives.
This patent was transmitted to Russell, and he afterwards
conveyed his interest in the land to the defendant. The
patent embraced the premises in controversy, and it was
admitted that the defendant was possessed of whatever title
passed by the conveyance of James Smith to Rufus Easton
in 1816, and that he had been in the adverse possession of
the premises for more than ten years prior to the com-
mencement of the present action.

The statute of limitations in Missouri, it is proper here
to say, enacted that "no action for the recovery of lands
shall be maintained unless the plaintiff, or person under
whom he claims, was seized or possessed of the premises
within ten years before the commencement of such action."

On the 30th of June, 1864, Congress passed an act, by
which it was enacted that all the right, title, and interest of
the United States

"In and to all the lands within the respective boundaries of
the following described locations in township forty-five north
of the base line, in range seven east, of the principal meridian
line of the State of Missouri, made by virtue of certificates is-
sued under the Act of Congress, approved February the 17th,
1815, entitled ' *An Act for the relief of the inhabitants of the late
county of New Madrid, in the Missouri Territory, who suffered by
earthquakes*,' shall be, and the same are hereby granted, relin-
quished, and conveyed by the United States in fee simple and
in full property, to the following mentioned persons respec-
tively, or their respective legal representatives, in whose names
said locations were severally made, to wit: *Location under certifi-
cate number* 159, *being survey* 249 i, *in the name of J. Smith, or his
legal representatives*. . . . .

"*Provided*, however, that nothing contained in the foregoing
provisions of this act shall, directly or indirectly, comprehend,
include, extend to, grant, relinquish, or convey the whole or any
part of any lot, tract, piece, or parcel of land in said township,
which has heretofore been confirmed and surveyed by the United
States, to any person or persons, or to the legal representatives

of any person or persons. And provided further, that nothing in this act shall in any manner abridge, divest, impair, injure, or prejudice any adverse right, title, or interest of any person or persons in or to any portion or part of the aforesaid lots, tracts, pieces, or parcels of land which are granted, relinquished, or conveyed by this act."

The plaintiff, relying upon this act of 1864, produced an instrument purporting to be a contract between one J. Smith and one A. P. Gillespie, dated on the 14th of April, 1816, by which the said Smith agreed to sell and convey to Gillespie, for the consideration of $100 already paid, and $50 to be thereafter paid, all his lots in the village of Little Prairie; and a deed from him to Gillespie, dated on the 5th of March, 1819, in terms conveying the two arpents of land in the village, and any certificate of location on land in the Territory, the sale of which was authorized by law. These instruments purported to be signed by the *mark* of J. Smith, and in the deed he described himself as of the county of New Madrid, *lately* of the village of Little Prairie. Fifty-two years afterwards these instruments were placed on record in the recorder's office of the county. The plaintiff contended that the grantor in this deed was the veritable J. Smith, who was the owner, in 1811, of the two arpents in the village of Little Prairie, and when the defendant produced the deed to Easton from James Smith abovementioned, he objected to its admission in evidence on the ground that it could not be presumed that a deed from James Smith, blacksmith, of Cape Girardeau, was a deed from J. Smith, of New Madrid; and now insisted that the court erred in admitting it. It was admitted that the plaintiff was possessed of whatever title passed by the deed to Gillespie.

The defendant also introduced in evidence the patent of the United States, issued as abovementioned on the 27th of May, 1827, and to its introduction the plaintiff objected, 1st, because the said patent was void in consequence of having been located upon land the sale of which was not authorized by law; 2d, because said patent had been judicially decided by the Supreme Court of the United States to be null and

void, in the case of *Easton* v. *Salisbury*,* *Stoddard* v. *Chambers*,† and *Mills* v. *Stoddard* ;‡ 3d, because it was located upon land reserved from sale, and was not located in accordance with sectional and quarter-sectional lines, and was upon land not surveyed, and was not located in season to be validated by the act of Congress approved April 26th, 1822.

The act here referred to was thus:

*"An Act to perfect certain Locations and Sales of Public Lands in Missouri.*

" *Be it enacted, &c.*, That the locations heretofore made of warrants issued under the act of the 15th of February, 1815, entitled ' An act for the relief of the inhabitants of the late county of New Madrid, in the Missouri Territory, who suffered by earthquakes,' if made in pursuance of the provisions of that act, in other respects, shall be perfected into grants in like manner as if they had conformed to the sectional or quarter-sectional lines of the public surveys; and the sales of fractions of the public lands heretofore created by such locations shall be as valid and binding on the United States as if such fractions had been made by rivers or other natural obstructions.

"SECTION 2. That hereafter the holders and locators of such warrants shall be bound, in locating them, to conform to the sectional or quarter-sectional lines of the public surveys, as nearly as the respective quantities of the warrants will admit; and all such warrants shall be located within one year after the passage of this act; in default whereof the same shall be null and void."

[The more specific character of some of these three objections appears in the argument, as below given, for the plaintiff in error.].

The court overruled the objections, and permitted the patent to be read in evidence, and overruled the objection taken to the introduction of the deed from James Smith to Easton; and to the ruling of the court in each particular the plaintiff's counsel excepted at the time.

The court then instructed the jury of its own accord that

---

* 21 Howard's Reports.          † 2 Howard.          ‡ 8 Id.

upon the evidence offered, and under the proof by plaintiff that the survey on which the patent issued was filed with the recorder within one year from the date of the act of 26th April, 1822, the patent issued to J Smith, in 1827, offered in evidence was a good and valid patent, and passed the title of the United States; and that if the jury believed from the evidence that the defendant had been in open, notorious, and continuous possession of the premises described in the declaration for ten years next before the commencement of this suit, claiming title under said patent, they should find a verdict for the defendant. To these instructions the plaintiff, by his counsel, excepted. The jury found for the defendant, and judgment being entered accordingly, the plaintiff brought the case here on error.

*Messrs. B. A. Hill and J. F. Darby, for the plaintiff in error:*

I. There is no evidence whatever to prove, or tending to prove, that "James Smith, blacksmith," of Cape Girardeau, ever lived in the village of Little Prairie, or even in the county of New Madrid, or that he ever owned any land there. The necessary conclusion is that he fraudulently personated the real J. Smith.

The next question is, as to the validity of the patent of 1827. If that patent is valid, the defendant has acquired the title by the statute of limitations, and if it be void, the title to the land sued for remained in the United States until the 30th June, 1864, and plaintiff was entitled to recover.

II. It is matter of professional notoriety that on the 17th February, 1815, and on the 26th April, 1822, when the New Madrid acts were passed, the sale of the public lands was authorized by law to be made, only in accordance with the sectional and quarter-sectional lines of the United States surveys. The acts of 17th February, 1815, and of 26th April, 1822, were passed to carry out the donations contemplated, in accordance with the existing laws for the sale of the public lands. Inextricable confusion would have resulted, if these provisions of the land laws had not been complied with by New Madrid claimants, and it is on this

account that the act of 17th February, 1815, therefore, requires that New Madrid locations shall be made only "on lands the sale of which is authorized by law."

Now, the J. Smith survey of March, 1818, was not made on any quarter-sectional lines. It was made *before* the public surveys of township 45, range 7 east, were executed, and before that township was sectionized. The survey was, therefore, a nullity.

If, indeed, a New Madrid location had been made upon this illegal survey of 1818, by filing it with the recorder of land titles *before* the passage of the act of 26th April, 1822, the first section of that act would have cured the illegality of the location, and the fractions created by it, in the quarter sections it cut into, could have been sold. But no *location*, as we assume the meaning of that word to be, of the J. Smith survey of 1818 was made until 1823, after the act of 1822 took effect; and the second section of the act of 1822 expressly barred the location of that survey after the passage of the act, that is to say, after 26th April, 1822.

The argument of the other side will be that the New Madrid *location* of J. Smith was made by the survey of March, 1818, and therefore, that the first section of the act of 1822 cured the fatal defect, that it did not conform to sectional lines, and was not made "on lands the sale of which was authorized by law." But the uniform decisions of this court from the case of *Barry* v. *Gamble** (A.D. 1843), down to *Rector* v. *Ashley*† (A.D. 1867), have established the law to be that a New Madrid *location* is *not* made by the survey, but is made only by filing the survey in the office of the recorder of land titles. It is, therefore, to be taken that the New Madrid location of J. Smith was made on the 26th February, 1823, when the survey of 1818 was filed in the office of the recorder of land titles, and was not made before. It is, therefore, void, because it was not made on sectional or quarter-sectional lines.

III. In *Stoddard* v. *Chambers*, reported by Mr. Howard,‡

---

\* 3 Howard, 32–3.　　　† 6 Wallace, 149.　　　‡ 2 Howard, 284.

this court decided, and on the ground that the land had been in fact and by law expressly reserved from sale, that a patent issued to Eustache Peltier, under a New Madrid location, *which*, as Mr. Howard's report of the case shows, *covered the greater part of the identical piece of land covered by the survey in this suit, and on the very same quarter-section*, was void. .

The case of *Mills* v. *Stoddard*, in 8th Howard,* decides equally, that any location of land while it was reserved from sale is void.   But this identical patent, now set up in this suit, has been adjudged void by this court in *Easton* v. *Salisbury*, also reported by Mr. Howard.† The report states the case was an ejectment brought by Alton Easton against Salisbury to recover certain lots in St. Louis County (the lots now in controversy), that the plaintiff claimed under a New Madrid patent, issued in 1827 to J. Smith or his legal representatives, and the defendant under a Spanish concession for three hundred and fifty arpents (including the premises then in controversy), which was confirmed to one Mordecai Bell in 1836.

The Supreme Court of Missouri decided against Easton, and he brought the case here.   This court, referring to well-known facts in the history of the public lands, said:

"It will be observed, that this controversy arises between a New Madrid title and a Spanish concession.   A holder of a New Madrid certificate had a right to locate it on any of the public lands which had been authorized to be sold.   This claim came into the hands of Easton, the plaintiff in error.   It was surveyed in March, 1818, and on the 28th May, 1827, the United States issued a patent to *J. Smith* or his legal representatives.

"From 1808 to the 26th of May, 1829, reservations were made from time to time to satisfy certain claims, but from that time they ceased, until renewed by the act of the 9th of July, 1832.

"During this period, it is understood by the plaintiff in error, the land in question was subject to be disposed of to any person, or in any manner, and was then open to entry or location.   And it is urged that the plaintiff had the right during *this* time to perfect his title.

---

* Page 345.                                 † 21 Howard, 426.

"The President of the United States has no right to issue patents for land, the sale of which is not authorized by law.

"Nothing was done to give Easton's title validity, from the cessation of the reservation in 1829, until its revival in 1832. His entry was made in 1818, and on the 28th of May, 1827, his patent was issued. The land located and patented having been reserved, was not liable to be appropriated by his patent.

"But it seems by the act of the 26th of April, 1822, it was provided that all warrants under the New Madrid act of the 17th of February, 1815, which shall not be located within one year, shall be held null and void. This law is decisive upon this point; all New Madrid warrants, not located within one year from the 26th of April, 1822, are null and void. Smith's or Easton's certificate for the New Madrid claim was void, and also his patent when issued, under the paramount claim of Bell, whose title was confirmed by the act of the 4th of July, 1836.

"There was no period from the entry and patent of the New Madrid claim in which the claim was valid. The location was not only voidable, but was absolutely void, as it was made on land subject to a prior right. And under the act of April 26th, 1822, all New Madrid warrants, not located within a year from that date, were declared to be void. Whether we look at the confirmatory act of 1836, which vested the title in the confirmee, *or to the New Madrid title asserted against it*, it is clear that the New Madrid title is without validity, and that the fee is vested in the grantee of Bell."

The Easton, party in that suit, was the Easton, party in this; and the report as given in Howard shows that the land was the same land.

IV. The true owner of the New Madrid title, finding that the patent to J. Smith was void under these decisions, did not attempt to enter upon the land that belonged to the United States, nor was he bound to regard the trespass of Easton thereon as a matter of any moment.

When Congress passed the act of 30th June, 1864, the title of plaintiff's grantors vested for the first time in him, under that act of Congress, and his right of action then accrued. He had no right of action before.

The defendant's possession of ten or fifty years signifies

nothing. He was not in by color of title, and could not be, for the land belonged to the United States. The true owner could not be aware of any title vesting until the act of 1864 was passed.

No time runs against the government. The case of *Gibson* v. *Chouteau**\* settles all questions on the statute of limitations.

*Mr. C. Gibson (with whom were Messrs. E. Casselberry and W. B. Thompson), contra.*

Mr. Justice FIELD, after stating the facts of the case, delivered the opinion of the court, as follows:

We are of opinion that the court ruled correctly in admitting the deed of James Smith to Easton. The deed describes the property as that claimed by J. Smith; it declares that the property was confirmed to the grantor by that name, and it gives the number of the certificate of confirmation. It was acknowledged before a judge of the Circuit Court and immediately placed on record, where it was open to inspection by every one. Easton acted openly upon the supposition that he had acquired the title of the two arpents, and the right of location on other lands, in consequence of their being materially injured by earthquakes. Upon his application such location was made in the immediate vicinity of St. Louis. He had a survey made of the land located by the official surveyor of the government. He had the survey transmitted to the recorder of land titles; and his successor in interest prosecuted the matter until he obtained a patent of the United States. In the meantime a severe and protracted litigation grew up between claimants under the deed and claimants under Spanish concessions, and in none of the controversies was any suggestion made that the grantor to Easton was not the veritable J. Smith who owned the two arpents of land in Little Prairie. It would have been manifest error if, in the face of these facts, after the lapse of half

_____
\* 13 Wallace, 93

a century, when the property acquired under the deed has become of immense value, and the city of St. Louis has extended over it, the court had held that the deed to Easton is not to be presumed to be the deed of J. Smith, of Little Prairie, because the grantor describes himself as James Smith, of the county of Cape Girardeau.   The real Smith had undoubtedly removed from the village of Little Prairie before the date of this deed.   That village had been greatly injured, if not destroyed, by the earthquakes, and the inhabitants had been authorized by Congress, in consequence of the injuries thus received, to select lands elsewhere. Cape Girardeau, until 1813, was a part of the county of New Madrid, and the simple fact that the grantor describes himself as of that place after Little Prairie had been abandoned, is of little consequence, as his identity with the original owner of the land is sufficiently stated in the body of the instrument.*

In the deed to Gillespie the grantor describes himself as *lately* of the village of Little Prairie, and this description is open to the same objection as the description of the residence of James Smith in his deed.   The reasonable and natural presumption arising from all the circumstances is, that Gillespie, finding, after receiving his deed, that Smith had already conveyed the property to Easton, and the right of location on other lands in consequence of its injury, did not assert any claim to the land, and that thus the deed had been suffered to remain without any attempt to enforce it until the increased value of the land located had tempted speculators to test its efficacy by litigation.   The execution of the contract and the second deed of Smith, with his mark, is a circumstance, but in the light of the facts following their execution, a slight one against the theory of identity of the grantors in the two deeds.   The use of a mark for his name may have resulted from temporary causes, or difficulty in writing, and not inability to write.   But whatever the cause, the use of the mark in the one case, and of

---

* See Mott v. Smith, 16 California, 554.

the name in the other, before a public officer, was sanctioned by the acknowledgment of the grantor, whether made by his own hand or by another in his presence and by his direction.

The objections taken to the admission of the patent in evidence were: 1st, that the patent was void, because located upon land the sale of which was not authorized by law; 2d, that the patent had been decided by the Supreme Court of the United States to be null and void in *Easton* v. *Salisbury*, reported in the 21st of Howard; in *Stoddard* v. *Chambers*, reported in the 2d of Howard, and in *Mills* v. *Stoddard*, reported in the 8th of Howard; and, 3d, that the patent was located upon land reserved from sale; was not located in accordance with sectional and quarter-sectional lines, but upon land not surveyed; and was not located in season to be validated by the act of Congress of April 26th, 1822.

The first objection may be disregarded, for there was no evidence of the fact, upon the supposed existence of which the objection is founded.

The cases cited under the second objection are not evidence in this case; the records of them are not before us. The reports of their decision in Howard may be referred to as expositions of law upon the facts there disclosed, but they are not evidence of those facts in other cases. In *Easton* v. *Salisbury* the controversy was between a Spanish concession to Mordecai Bell, and the title of Easton under the location upon the New Madrid certificate issued to Smith. The claim under the Spanish concession was confirmed by act of Congress to the legal representatives of Bell. The land claimed under this concession was reserved from sale, and could not, therefore, be covered by the New Madrid certificate. So far as the location interfered with the concession it was void, and to that extent the patent was void also, but no further. And that is all there is in the decision in that case. The general language of the opinion must be construed and limited by the facts of the case.

It is true the court said that by the act of April, 1822, it was provided that all warrants under the New Madrid act which were not located within one year were void; and it would seem that the court supposed that the warrant issued to Smith had not been located within that period. The court was speaking at the time of a completed and not an initiatory location, one which would appropriate the land; and evidently considered that there could be no such appropriation until the survey was returned to the recorder of land titles, as had been held in several cases.* Of such return after the passage of the act of 1822, there was no evidence in the record in that case. In this case it is admitted that the survey was thus returned within the year; and, consequently, the location of the tract was completed.

In *Stoddard* v. *Chambers*, and *Mills* v. *Stoddard*, the controversy was also between a Spanish concession and a New Madrid certificate. The patent issued in those cases upon the location of the New Madrid certificate, was held void because it covered land reserved from sale. There is nothing in that ruling which bears upon the question presented in the case at bar.

In several cases which were before this court prior to that of *Easton* v. *Salisbury*, it was held, as already stated, that there could be no effectual appropriation of the land located under a New Madrid certificate until the survey made by the officer of the government was returned to the recorder of land titles. The act of Congress, as will be seen by a reference to a prior page,† declared that when a location was made under its provisions, the title of the person to the land injured should vest in the United States. It contemplated that there should be a concurrent investiture of title; that the title of the owners of the land injured in New Madrid County should pass to the United States, and that at the same time the title to the land located in lieu thereof should pass to the claimant, or rather the right

---

* Barry *v.* Gamble, 3 Howard, 52; Lessieur *v.* Price, 12 Id. 74.

† *Supra*, p. 622.

to the title, for the strict legal title did not pass until the patent issued; and that this exchange of titles should take place when the claimant obtained his patent certificate, or the right to such certificate, and that he could not acquire until the plat of the survey was returned to the recorder of land titles. Until the plat was placed in the public depository in the Territory, of evidences of title issuing from the United States, there was no official recognition of the proceedings taken by the claimant which bound the government.

It often happened that the location made at the request of claimants by deputy surveyors were upon lands which had not been surveyed by the government, or if surveyed the locations did not conform to the sectional and quarter-sectional lines of the surveys. To remedy defects of this character Congress passed the act of April 26th, 1822. That act refers in its first section to the actual locations made by the deputy surveyor at the request of the claimant, and not to the completed appropriation of the land by the return of the plat of the survey to the recorder of land titles.

The actual location of the New Madrid certificate issued to Smith, was made and approved in 1818; and any objection to it for want of conformity to the lines of the public surveys, was removed by the first section of the act of 1822. This actual location became a perfected location so as to appropriate the land on the return of the survey to the recorder in 1823, except as against the Spanish concession, which was confirmed to the representatives of Bell. Besides this, a defect in a survey is cured by the issue of a patent thereon.

It follows from the views expressed that the Circuit Court did not err in its rulings, and its judgment must be

　　　　　　　　　　　　　　　　　　AFFIRMED.