**BALL v. PARAMOUNT PICTURES, Inc., et al.**

Civil Action No. 2963.

District Court, W. D. Pennsylvania.

Aug. 30, 1946.

**2**

See also 4 F.R.D. 194.

Thorp, Bostwick, Reed & Armstrong, all of Pittsburgh, Pa., and Roy G. Bostwich, and James S. Crawford, III, all of Pittsburgh, Pa., and Rawle & Henderson and Joseph W. Henderson, all of Philadelphia, Pa., for plaintiff.

Reed, Smith, Shaw & McClay, James H. Beal, Smith, Buchanan & Ingersoll, and John G. Buchanan, all of Pittsburgh, Pa., and Schnäder, Kenworthey, Segal & Lewis, Bernard G. Segal, William A. Schnader, and John E. Mulder, all of Philadelphia, Pa., for defendants.

John G. Buchanan and Smith, Buchanan & Ingersoll, all of Pittsburgh, Pa., for Loew's Inc.

GIBSON, District Judge.

The prior proceedings and the bulk of the testimony taken in this suit were before Judge SCHOONMAKER. After his death the case was continued under the following stipulation:

"Now, February 4, 1946, the Honorable Frederic P. Schoonmaker, Judge of this court, having died after the beginning of the trial of this action, it is hereby stipulated that the trial may be continued before such Judge of this court as may be assigned thereto, and that all proceedings before Judge Schoonmaker on and after July 24, 1944, shall be deemed to have been before such assigned Judge."

By the original complaint, filed April 12, 1944, the defendants named were Paramount Pictures, Inc., Pennware Theatre Corporation and A. N. Notopoulos. On July 6, 1944, by amendment the other defendants were joined.

The defendants will hereinafter be referred to as follows: R. K. O. Radio Pictures, Inc.—"R. K. O."; Twentieth Century-Fox Film Corporation—"Twentieth Century-Fox"; Paramount Pictures, Inc.— "Paramount Pictures"; Paramount Film Distributing Corporation — "Paramount Film"; Pennware Theatre Corporation— "Pennware"; and A. N. Notopoulos as "Notopoulos".

Prior to May 15, 1933, Paramount Pictures owned all the stock of Atlantic States Theatre Corporation, which in turn owned all the stock of Pennware. On May 15, 1933, Notopoulos purchased from the Paramount subsidiary, for $1,000, one-half of the stock of Pennware. He had been a motion picture theatre operator since 1912. After acquiring his interest in Pennware, he entered into a contract with Paramount Pictures pursuant to which he became manager and supervisor of the local Penn Theatre, and thereafter he negotiated with the distributors of moving pictures for those which were exhibited in the Penn Theatre, which then, and thereafter until April 30, 1944, was under lease by Pennware. Paramount Pictures, under the arrangement, was only interested in the leasing and purchase of theatres and in borrowing money.

In 1939, one Goldstein, owner of the Penn Theatre, leased it to Pennware for a five-year term ending April 30, 1944. By a supplemental contract the ownership by Pennware of all equipment and fixtures was determined, and also the right to remove them upon termination of the lease.

From the time when Notopoulos obtained his interest in the Penn Theatre, Paramount Film licensed all its first run pictures at that theatre. And for more than ten years prior to April 30, 1944, R. K. O., Loew's and Twentieth Century-Fox had licensed Pennware to exhibit one-half of their first run motion pictures at that theatre, and the other half of such first run pictures was licensed to Warner Brothers Circuit Management in Ambridge, at either the Ambridge or Prince Theatre, both operated by Warner Brothers.

Somewhat less than a year before August, 1943, Harry L. Goldstein had sold

the Penn Theatre to one Albert Mannheimer, who, in August of 1943 sold it to the plaintiff, Harry Norman Ball, for $110,000. Mr. Ball purchased the property as trustee for himself, his wife, his brother, Joseph A. Ball, his wife's sister, Flora Friedman, and his brother-in-law, Henry Friedman. None of the cestui que trustent were operators of a moving picture theatre except Henry Friedman, who had operated a fourth run house in Philadelphia.

Shortly after the purchase of the theatre site the plaintiff proposed to Joseph Bernhard, executive vice-president of Warner Brothers Pictures, Inc., that the Penn Theatre be operated in a pool with the Ambridge and Prince Theatres. Mr. Bernard postponed a discussion of this proposition until plaintiff should be in possession of his theatre. Plaintiff did not discuss the matter of a lease with Notopoulos until he had title to the Penn Theatre for some months.

Pennware having reason to anticipate trouble in renewing its lease of the Penn Theatre, early in 1943 had bought ground for a theatre at 745-751 Merchant Street, in Ambridge, the same street on which was the Penn Theatre, and several squares from it. In October, 1943, construction work began. Plaintiff learned of the work in November. His first action thereafter was to notify Pennware that its lease was cancelled and to demand possession. This followed a dispute with Notopoulos over a claim by the latter that plaintiff owed for heat and janitor service. This notice was repeated, but the matter was settled without any eviction.

After the proposed eviction plaintiff sent a telegram to the War Production Board in which he urged that body to stop the building of Pennware's theatre.

Then began negotiations for the lease of the Penn Theatre. Plaintiff demanded 15% of the gross income. This would have resulted in a loss to Pennware during the last six years of operation and it refused to agree to such terms. The rent therefrom had been $3,600 per year. Pennware offered to pay $6,000 per year during the war time, and $5,000 annually thereafter. Plaintiff persisted in his claim of 15%

rental. This demand was not in accordance with ordinary usage in Ambridge or a town of a like size.

Negotiations for the renewal of the lease failed and Pennware continued with the construction of his State Theatre, and plaintiff instituted his present action. As stated, supra, the first defendants were Paramount Pictures, Inc., Pennware Theatre Corporation and A. N. Notopoulos. Plaintiff was apparently unaware that Pennware was the owner of the equipment and fixtures in the Penn Theatre and was authorized to remove them at the expiration of the lease. His first effort was to secure a preliminary injunction to restrain the removal of the fixtures from his theatre. After hearing, and being informed of the ownership of Pennware, the application for the preliminary injunction was abandoned. Later the other exhibitor defendants were added.

The complaint, as amended, recites ownership of the Penn Theatre property in the plaintiff as trustee, and describes the defendants. Jurisdiction is averred as under the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1-7, 15 note, and Clayton Act, 38 Stat. 730, and the venue is set forth. The defendants, other than Notopoulos, were alleged to be engaged in interstate commerce in the production, distribution and exhibition of motion pictures. As such they are alleged to have "circuit buying power" by reason of their connection with the numerous theatres in which their pictures are exhibited. The importance of Paramount Pictures and its subsidiaries is accentuated.

In charging violations of the Sherman and Clayton Acts the complaint sets forth the possession of the Penn Theatre by Pennware under the lease expiring April 30, 1944, and that for many years past that theatre had enjoyed first run exhibition pictures of all Paramount Pictures, and one-half of the product of R. K. O., Loew's and Twentieth Century-Fox. It then declares that: "The Paramount defendants" (as describing Paramount Pictures, Paramount Film, Pennware and Notopoulos) in 1943 entered into a conspiracy to depreciate and destroy the value and productive possi-

4

bilities of the Penn Theatre. This conspiracy was to be carried out by depriving that theatre of the runs theretofore enjoyed by it, this is to be effected by the power in the industry of the Paramount defendants. This charge was repeated as to Paramount defendants and R. K. O., Twentieth Century-Fox and Loew's and the object of the combination was alleged to be the ruin of the Penn Theatre by depriving it of the runs of motion pictures theretofore enjoyed by it. To effect the object of the conspiracy it is asserted that all the defendants refused to license their product to the Penn Theatre, and imposed other uniform restraints upon it. The complaint further contains a charge that "the Paramount defendants", while removing after expiration of the lease, maliciously damaged the theatre for the purpose of delaying its use and to accomplish the general objective. As part of the violation of law charged it is further generally alleged that the acquisition by Paramount of the stock of Pennware, and the acquisition by Paramount and the other producer-exhibitor defendants of stock in other motion picture exhibiting companies has the effect of substantially lessening competition and restraining trade "in the section or community where such corporation or corporations operate."

After praying that summons be issued, and that the combinations in restraint of interstate trade and commerce described in the complaint be declared in violation of the Sherman and Clayton Acts, the plaintiff further prays for relief, in part, as follows:

"(3) That the acquisition by Paramount of the stock of Pennware Theatre Corporation and other corporations, where such acquisition has the effect of substantially lessening competition between Paramount and the corporation, whose stock is so acquired, or to restrain such commerce in any section or community, be declared illegal and violative of the Sherman Anti-Trust Act and the Clayton Act.

"(4) That the acquisition by any defendant of the stock of any other defendant or subsidiary thereof, where such acquisition has the effect of substantially lessening competition between the acquiring defendants and the corporation, whose stock is so acquired, or to restrain such commerce in any section or community, be declared illegal and violative of the Sherman Anti-Trust Act and the Clayton Act.

"(5) That the integration of production and exhibition in the Paramount defendant be declared violative of the Sherman Anti-Trust Act and the Clayton Act.

"(6) That preliminary until hearing and perpetually thereafter, the defendants herein, and each and all of their respective officers and directors, and each and all of their respective agents, servants and employes, and all persons acting and claiming to act on their behalf, or any of them, be enjoined and restrained from the commission of any act in restraint of interstate trade, and from carrying out any plans, agreements or contracts to impair or damage the Penn Theatre or withhold or deprive the Penn Theatre of motion picture product on the run formerly enjoyed by the Penn Theatre.

"(7) That preliminarily until hearing and perpetually thereafter, the defendants herein be enjoined and restrained from entering into any contracts or agreements for the licensing of feature product on the run formerly enjoyed by the Penn Theatre.

"(8) That preliminarily until hearing and perpetually thereafter the defendants be enjoined and restrained from continuing the discriminatory practices against the Penn Theatre and from enforcing contracts heretofore made or from making new contracts imposing protection against the Penn Theatre in favor of any other theatre or theatres in the exhibition of motion pictures."

The 7th prayer reflects the plaintiff's theory, or at least his earliest theory, of the case, and which has not been wholly abandoned. The contention was, in substance, that if a certain run of motion pictures had been exhibited in a theatre for several years, that theatre was entitled to the run as against any subsequently constructed theatre, even though its management had changed; or, to put the claim in other words, that the *theatre,* the house, is entitled to the run no matter who is op-

erating it. Such a position is not tenable. Those producers or exhibitors of motion pictures who have granted preferred runs for a number of years to a particular theatre, with intent to prefer it to an equally desirable independent theatre, may be guilty of a violation of the anti-trust laws. See Goldman Theatres v. Loew's et al., 3 Cir., 150 F.2d 738 in which the principle is laid down. That decision does not state a method of enforcing the right of the independent theatre except that injunctive relief was approved.

Both parties herein have called the attention of the court to the opinion of a three-judge expediting court, United States v. Paramount Pictures, Inc., D.C., 66 F.Supp. 323, and some seven others of the chief moving picture producers and exhibitors. Counsel for the plaintiff have endeavored to strengthen the findings of fact in the instant case by adding those of the expediting court as set forth in the opinion in that case. No decree has been filed in the New York case, but even if it had been this court cannot adopt the findings of fact in one case and apply them in another. Mackay v. Easton, 19 Wall. 619, 86 U.S. 619, 22 L.Ed. 211. This is elementary.

United States v. Paramount et al., supra, was an action brought by the Department of Justice by which the regulation of the exhibition of moving pictures by the eight largest producers and exhibitors and some thirteen others was sought throughout this entire country. Assuming that the decree will reflect the opinion, it will be appealed by both parties in all probability. This likelihood possibly weakens it as a citation of legal principles, but time and again the opinion declares that the only correct way of licensing pictures, as between theatres of equal size and qualifications, is to grant each picture to the highest bidder—and this irrespective of past connection of the producer with the exhibiting theatre. If a dispute exists as to the relative ability of the theatres to return revenue, that is a matter for determination by a regulating body, as contemplated by the opinion. If such a body is not in existence it would seem that the producer might be trusted to decide the matter, provided it was acting from a consideration of the essential facts involved, such as capacity of the theatres, financial responsibility of the operators, and the comparative ability of the operators as showmen.

It must be kept in mind that the instant action is not one in which the United States is seeking to regulate the industry throughout the entire country, but is one which had its origin in a dispute between the owner and a proposed lessee of a theatre. The court is called upon to say whether the defendants conspired to violate the anti-trust laws of the United States, and if their actions affected the legal rights of the plaintiff. This means that many contentions which have been advanced by briefs and verbal arguments must be put aside, as not contemplated by the pleadings or reflected in the testimony.

Plaintiff has quoted United States v. Paramount, supra, and has complained about alleged injury to plaintiff in fixing prices of admission. No issue as to such matter is raised by the complaint or testimony. The only demand of the plaintiff, which contemplates possible injury to himself is found in his prayer for an injunction against defendants by which they are prevented from issuing first runs to Pennware and are required to grant such runs to himself. He was not interested in second or third runs, although certain of defendants did suggest such runs to him without any price or prices mentioned.

The same remark may also be noted in respect to clearances. Plaintiff was not interested in clearances because he was not interested in any runs except the first. He declined to consider any other. As a matter of fact, the United States v. Paramount opinion did not undertake to condemn all clearances, but left them to be considered by the Arbitration Board which it contemplated.

Plaintiff's brief also points to the opinion of the expediting court in respect to Formula Deals, Master Agreements and Franchises; also to Block-booking. These practices appeared not at all in the instant

case and certainly did not injure the plaintiff.

Pooling agreements were also mentioned among the sins of the defendants in the New York case. The only evidence in this action as to pooling related to the attempt of the plaintiff to enter into such an arrangement with Mr. Bernhard to pool the Warner, Prince and Penn Theatres.

■ The one actual issue raised by the pleadings and testimony is found in the charge that defendants conspired to violate the Sherman and Clayton Acts to the injury of plaintiff. First we may consider the connection between the Paramount companies and Notopoulos. Even under the drastic provisions of the New York Paramount opinion, supra, the association between them was not a restraint of commerce. Paramount did not buy stock from Notopoulos, through any force, but sold him a one-half interest in its Ambridge corporation. Instead of creating a restraint of commerce the transaction was a widening of interest in favor of the independent exhibitor. As conditions then existed (and as they still exist we think) Paramount and Notopoulos had the right to build a theatre in competition with the Penn Theatre. If it was equal to that theatre in location and earning power, revenue only considered, it had an equal right to first runs as had the Penn Theatre; and if it was to be operated by an experienced and reputable exhibitor, as opposed to an unknown and inexperienced operator, it had a better right to them. And this right would be doubly entrenched if it had a larger and equally located theatre with greater revenue capacity. No question can possibly exist as to the right of Notopoulos and Paramount to put their theatre in competition with the Penn Theatre for first runs. The natural interest of Pennware would have dictated the allowance of its first run pictures to the State Theatre as opposed to the Penn Theatre. As to that phase no conspiracy was necessary.

Plaintiff has further charged that Pennware, in furtherance of its alleged intent to injure the Penn Theatre and to delay it in resuming operations, wilfully injured that theatre in removing its equipment therefrom at the expiration of the lease. Considerable delay was alleged by reason of such damage. The persons engaged in the removal of the equipment were only Notopoulos and his son. The testimony as to unnecessary damage is quite conflicting, the weight of it apparently being with the defendants. The witness called by plaintiff asserted great delay occasioned by reason of the method of removal which he criticized. The testimony of the witness was exaggerated particularly in respect to the cause of delay in renewing the Penn Theatre as a moving picture house. The chief cause of delay was the inability to obtain equipment and supplies needed. This fact is admitted by the witness at times during his examination. Photographs of the interior of the theatre were offered by both the plaintiff and the defendants, those of defendants having been taken just as Notopoulos removed from the building and those of plaintiff several days later. Defendants' photographs show less damage than those of plaintiff.

■ Plaintiff points to the unity of action on the part of defendants, and asserts that it proves his claim that they were acting in a conspiracy against the Penn Theatre. Paramount Film, R. K. O., Loew's and Twentieth Century-Fox each granted to the State Theatre the first runs which the Penn Theatre had under Notopoulos' management. This unity plaintiff attributes to the prominence of Paramount in the moving picture industry and its numerous theatre connections throughout the country and its circuit buying power.

It is undoubtedly true that joinder by a number of persons in the same course of action may, under all the circumstances, be sufficient to establish that they were pursuing that course by actual or implied agreement. For example, the case cited supra, Goldman Theatres v. Loew's et al., 3 Cir., 150 F.2d 738. In that suit there was unity of action in respect to a number of theatres in the City of Philadelphia which had long continued to the detriment of other theatres equal in every way to those favored. Also, as the court pointed

out and accentuated, none of the persons who united in granting the favored runs were called to the witness stand. Under those facts the finding of an agreement in restraint of commerce might well be made. But the facts of that case are not under consideration here. In the first place, the defendants have not shown favor to a number of theatres over others of equal standing. Here were but two theatres, and both could not have the first runs which each might desire, as each of the producer-exhibitors had only the one first run to grant in Ambridge. A choice had to be made between them. Putting aside the plaintiff's untenable claim that he was entitled to the runs merely because they had been exhibited in his theatre for a number of years, we come to the tangible reasons upon which the choice was made.

In making the choice each of the defendant distributors acted independently. R. K. O., Loew's and Twentieth Century-Fox, by the testimony of their respective agents who passed upon the licenses, acted independently of each other and of Paramount Pictures and Paramount Film. Even Paramount Film was not approached by its parent corporation, but only by Notopoulos as manager of Pennware. The reasons for their decisions were sound and based upon common sense, and the testimony of the agents who awarded the runs to Pennware, backed up by this fact, cannot be ignored.

One applicant for first runs was well known in Ambridge, had long experience in moving pictures and was known to be an able exhibitor and a desirable customer. He had a theatre which was equal to the Penn Theatre in location and was more than one and one-half times as large as that theatre, and therefore a greater revenue could be expected from it. The other applicant was a stranger in the community, whose ability as an exhibitor and whose credit were unknown, and whose theatre was much less in size than that of his competitor. The applicants being so contrasted, it seems plain that the producers of pictures had the right to choose the licensee they desired. Unity of action was not due to an unlawful combination against plaintiff or his theatre.

Plaintiff's complaint will be dismissed.

## Opinion.

The court, after hearing and consideration, makes the following Findings of Fact and Conclusions of Law:

### Findings of Fact.

1. The plaintiff, Harry Norman Ball, is a citizen of the United States and a resident of the Commonwealth of Pennsylvania, and is the registered owner, as Trustee of certain lots of land in the First Ward of the Borough of Ambridge, fronting on Merchant Street. The improvements thereon consist, inter alia, of a motion picture theatre generally known as the Penn Theatre.

2. Paramount Pictures, Inc., is a corporation organized and existing under the Laws of the State of New York, and is engaged in interstate commerce in the production, distribution and exhibition of motion pictures, either directly or through subsidiary or associated companies, has an agent, and transacts business in the Western District of Pennsylvania. As a producer of motion pictures and also distributor and exhibitor thereof, Paramount Pictures, Inc., and companies in like position, are sometimes referred to as producer-exhibitors.

3. Paramount Film Distributing Corporation is a corporation organized and existing under the Laws of the State of Delaware, is engaged in interstate commerce in the distribution of motion pictures, produced by Paramount Pictures, Inc., has an agent and transacts business in the Western District of Pennsylvania. The said corporation is wholly dominated and controlled by Paramount Pictures, Inc.

4. Pennware Theatre Corporation is a corporation organized and existing under the laws of the State of Delaware, and is engaged in the exhibition of motion pictures.

5. A. N. Notopoulos is engaged in the exhibition of motion pictures individually, and by and through corporations wholly controlled and dominated by him operates a number of theatres within the jurisdiction of this Court. He is president of Pennware Theatre Corporation.

6. Paramount Pictures, Inc., owns 50% of the stock of Pennware Theatre Corporation, and is also interested as a partner with the said A. N. Notopoulos in other motion picture theatre situations, and has acquired stock with said A. N. Notopoulos in motion picture corporations.

7. R. K. O. Radio Pictures, Inc., is a corporation organized and existing under the Laws of the State of Delaware, is engaged in interstate commerce in the production, distribution and exhibition of motion pictures, has an agent and transacts business in the Western District of Pennsylvania.

8. Loew's, Inc., is a corporation organized and existing under the Laws of the State of Delaware, is engaged in interstate commerce in the production, distribution and exhibition of motion pictures, has an agent and transacts business in the Western District of Pennsylvania.

9. Twentieth Century-Fox Film Corporation is a corporation organized and existing under the Laws of the State of New York, is engaged in interstate commerce in the production, distribution and exhibition of motion pictures, has an agent and transacts business in the Western District of Pennsylvania.

10. Paramount Pictures, Inc., Paramount Film Distributing Corporation, R. K. O. Radio Pictures, Inc., Loew's Inc., and Twentieth Century-Fox Film Corporation are engaged inter alia in the distribution of motion picture film in interstate commerce throughout the United States, and in connection therewith, they solicit exhibitors showing motion pictures in the various states to enter into contracts with them, to exhibit motion picture films in the theatres operated and controlled by the exhibitors, and in the furtherance of such business, procure from the exhibitors signatures to tentative agreements, which agreements they then forward to their offices in New York, and after same are approved and signed at such offices, return the same to the exhibitors wherever same are situate throughout the United States. Such agreements having been consummated, they cause, procure and secure the shipment of prints from California and New York to film exchanges in some thirty-two key cities, including Pittsburgh, in the United States, for delivery by such exchanges to exhibitors in nearby states, and also transport from state to state advertising, printed matter and advertising reproductions of partial scenes of acts in the said moving pictures, to permit the display thereof in, at or about the theatres of the exhibitors. All of the said acts are either in or directly affect the trade and commerce among the several states.

11. In connection with the various phases of the motion picture industry involved in this action, each and every part thereof directly affects interstate commerce.

12. Paramount Pictures, Inc., directly, or by and through associated and subsidiary companies, operates approximately 1600 theatres in the United States, more than twice the number of any other producer-exhibitor in the United States.

13. Paramount owns stockholding interests in approximately 300 corporations operating approximately 1600 theatres.

14. Prior to May 15, 1933, Atlantic States Theatre Corporation a Delaware corporation and wholly owned subsidiary of Paramount Pictures, likewise a Delaware corporation, owned all of the capital stock of Pennware, a Delaware corporation. Pennware, an exhibitor of motion pictures, operated the Penn Theatre located on Merchant Street at Fifth Street in Ambridge, Pennsylvania (Paramount Exhibit No. 1, R. 861).

15. On May 15, 1933, Notopoulos, who had been an operator of motion picture theatres since 1912, purchased from Atlantic States Theatre Corporation, one-half of the issued and outstanding shares of the capital stock of Pennware, and assumed the management and supervision of the Penn Theatre, including the buying of, booking and setting of play dates for motion pictures to be exhibited at the Penn Theatre, as well as the maintaining of books and records of account pertinent thereto. On November 6, 1933, Notopoulos was elected President of Pennware and has continued to be President thereof ever since. Neither Paramount Pictures nor anyone acting in its behalf, has had any part in or influenced

the obtaining of licenses of motion pictures by Pennware for showing in the Penn Theatre or the State Theatre, nor in any manner participated in the operation of the Penn Theatre by Notopoulos. Its activity in connection with Pennware was only to pass upon matters not directly connected with the operation of the Penn Theatre, such as sizable capital expenditures, the leasing or purchasing of real estate, and the borrowing of money.

16. By lease dated May 22, 1939, Pennware leased from Harry L. Goldstein the premises occupied by the Penn Theatre, for a term of five years from June 1, 1939 to April 30, 1944, at a yearly rental of $3,600. By written memorandum dated June 1, 1939, duly executed by Notopoulos, President of Pennware, and Harry L. Goldstein, it was provided that at the termination of the lease Pennware might remove the furnishings of the theatre, including chairs, moving picture equipment, screens, sound equipment, carpets, light fixtures, display frames, ticket booths, removable portions of cooling system, and the portion of the marquee other than the steel framework, and that such property remained the property of Pennware.

17. From and after the year, 1933, Paramount Film licensed Pennware to exhibit all of its feature motion pictures first run at the Penn Theatre. For varying periods, but in each case for not less than ten years preceding May 1, 1944, R. K. O., Loew's and Twentieth Century-Fox each separately licensed Pennware to exhibit one-half of its feature motion pictures first run at that theatre, and licensed Warner Brothers Circuit Management Corporation to exhibit the other half of its feature motion pictures first run in Ambridge, either at the Ambridge Theatre or at the Prince Theatre.

18. On February 5, 1943, Pennware purchased the premises at 745-51 Merchant Street, Ambridge, for the purpose of erecting a new theatre for the exhibition of motion pictures first run. Albert Mannheimer, a New York real estate broker, who had acquired the Penn Theatre property, had set a figure of $125,000 for the sale or a figure of $12,000 a year for the rental to Pennware. At a rental of $3,600 a year for the theatre, the net income or loss from its operation had been as follows: 1934—$4,559.81; 1935—$3,868.54; 1936—$9,787.77; 1937—$9,490.31; 1938—$1,287.88; 1939—$2,903.79 (Loss); 1940—$1,022.58 (Loss); 1941—$3,340.07; 1942—$3,639.97; 1943—$7,873.96.

19. In August, 1943, Harry Norman Ball, the plaintiff, purchased for the sum of $110,000 the premises housing the Penn Theatre, as trustee for his wife, Ethel H. Ball, his brother, Joseph A. Ball, his wife's sister, Flora Friedman, and his brother-in-law, Henry Friedman. Plaintiff and his brother, Joseph A. Ball are Philadelphia lawyers and neither has an interest in any other theatre nor has ever operated a motion picture theatre. Henry Friedman was operating a fourth run neighborhood theatre in Philadelphia under a pooling arrangement with Warner Brothers.

20. The first contact the plaintiff had with anybody after purchasing the Penn Theatre as with Joseph Bernhard about ten days after plaintiff acquired the theatre, when plaintiff proposed that the Penn Theatre be operated jointly with the Ambridge and Prince Theatres in a pool, these three theatres being the only theatres in Ambridge. Mr. Bernard concurred with plaintiff's suggestion that economies could be effected if a cooperative operation of the houses could be agreed upon, but stated that he did not think it feasible to discuss details until the plaintiff acquired possession of the theatre.

21. During October, 1943, construction work was begun on a new theatre for Pennware on the premises purchased by that corporation at 745-51 Merchant Street, Ambridge. In November, 1943, plaintiff first learned of the construction of a new theatre, which he inferred from having heard of the placing of a steam shovel on the site of the State Theatre.

22. On November 9, 1943, plaintiff notified Pennware of the cancellation of its lease of the Penn Theatre for failure to pay rental due for October and November, 1943, and demanded possession. On November 16, 1943, plaintiff again notified Pennware of the cancellation of the lease and again demanded possession. There was a controversy over a claim of Pennware

that plaintiff owed a contribution toward heat and janitor service, which controversy was settled on January 5, 1944, without Pennware being evicted from the Penn Theatre.

23. During December, 1943 or January, 1944, plaintiff consulted Joseph Bernhard about the possibility of stopping the building of the State Theatre, and sent a telegram to the War Production Board urging that that agency stop the building of the State Theatre.

24. The first discussion between the plaintiff and Notopoulos concerning the renewal of the lease of the Penn Theatre took place on January 5, 1944, the negotiations continuing until March 3, 1944. Pennware offered to pay plaintiff, for the rental of the theatre, $6,000 annually during the war years, and $5,000 annually thereafter, or $7,000 net annually (i. e., plus taxes, insurance and heat) for the rental of the entire premises. Plaintiff insisted upon a rental of 15% of the gross receipts of the Penn Theatre. The payment of rental at this rate would have resulted in a loss in the operation of the Penn Theatre during each of the six years immediately preceding the date of these negotiations. The lease was not renewed. It is usual and customary in the motion picture industry for theatre leases in towns of a size comparable to Ambridge to be on a flat rental basis, and it is only in cities very much larger than towns like Ambridge that theatre leases based upon a percentage of the theatre receipts are resorted to. All theatres operated by Notopoulos which are under lease are leased upon a flat rental basis, and none of them is leased on a basis of gross receipts from the theatre operations. Throughout the negotiations Pennware and Notopoulos acted in good faith and in an honest effort to renew the lease on reasonable terms, intending to exhibit pictures second and third run in the Penn Theatre.

25. On April 12, 1944, plaintiff instituted an action in this Court, under the anti-trust laws of the United States, against Paramount Pictures, Pennware and Notopoulos, requesting the Court, inter alia, to restrain the removal by Pennware of fixtures, furniture and equipment from the Penn Theatre, and to restrain the defendants from entering into any contracts for the licensing of films on the run on which motion pictures had theretofore been shown at the Penn Theatre by Pennware. On April 27, 1944, after much testimony had been taken, plaintiff voluntarily withdrew his request for a preliminary injunction.

26. Pennware caused its furnishings and equipment to be removed from the Penn Theatre from April 27, 1944, to April 30, 1944. The removal was accomplished in a careful and workmanlike manner, without malice, or any intent to delay operation of the Penn Theatre by plaintiff (R. Notopoulous Exhibits Nos. 7–12, and 14–25, R. 1079, 1086, 1116).

27. The State Theatre site, is located at 745–51 Merchant Street, Ambridge, diagonally across Merchant Street from the Ambridge Theatre, the largest theatre in Ambridge. The State Theatre is a newly constructed, modern, brick building, has 725 seats with provision for a balcony to contain at least 250 additional seats, and is air conditioned. The Penn Theatre, located at 498 Merchant Street, south of the State Theatre, had a seating capacity of 546 seats, subsequently reduced by 50 seats by plaintiff.

28. The town of Ambridge has a population of between 21,000 and 22,000. The main residential section is north and northeast of the State Theatre, and that is the only direction in which the town can expand. Eleventh Street, Ambridge, is connected with Aliquippa, South Heights, Glenwillard, and Five Points by a bridge across the Ohio River (R. 1634, 1635).

29. All dealings of each of the defendants Paramount Film, R.K.O., Loew's and Twentieth Century-Fox concerning the licensing of Pennware to exhibit motion pictures in both the Penn and the State Theatres have been with Notopoulos and his sons; and no such dealings have been with representatives of Paramount Pictures.

30. Notopoulos is an experienced and competent motion picture theatre operator, is a good showman, and is highly regarded in the industry and in the community at large. Pennware, through Notopoulos and

his sons, has had satisfactory business relations with the defendant distributors for many years and a consistently good record for performing the obligations of its contracts with them.

31. Each of the motion pictures distributed by each of the defendants R. K. O., Loew's Twentieth Century-Fox, and Paramount Film is copyrighted under the laws of the United States, and each of the said defendants licenses theatre operators to exhibit the motion pictures distributed by it. The production of a feature motion picture costs from several hundred thousand dollars to three million dollars per picture. From the original negative of a picture, positive prints are made and these are used for distribution to exhibitors. The cost of making a positive print ranges from $150 up to $700 a picture, depending upon length and color. In most cases, the license fee paid to a distributor by an exhibitor for exhibition of a picture in a theatre does not equal even the cost of making one positive print. The number of prints is necessarily limited in view of their high cost, and consequently each print must be used for exhibition in a large number of theatres. On the average the distributors have made about 300 to 350 prints of a picture for exhibition in 12,000 to 15,000 theatres. In the Pittsburgh area, which includes Ambridge, the distributors have made available 8 to 15 prints for exhibition in 450 to 500 theatres. This condition makes it necessary to arrange a sequence for the use of the limited number of prints by exhibitors in the large number of theatres in an orderly manner in order to secure the return of the large costs of production and distribution.

32. In licensing Pennware for first run exhibition of motion pictures in the State Theatre, each distributor acted independently without consulting any other distributor and without concert of action. No representative of Paramount had any active part in obtaining such licenses.

33. In obtaining licenses for first run exhibition of motion pictures in the State Theatre, neither Pennware nor Notopoulos combined or conspired with any of the defendants in restraint of trade or commerce.

34. Loew's R. K. O., and Twentieth Century-Fox each had knowledge that Paramount Pictures, Inc., had an interest in the Pennware Theatre, but had dealt only with Notopoulos, or his sons in licensing pictures to that theatre. When each of them decided to license the State Theatre, as opposed to the application of plaintiff for the Penn Theatre, it did not know of the intention of the others to license the State Theater. In concluding to license the Pennware Theatre each considered the fact that that theatre was managed by an experienced exhibitor of moving pictures, whose credit had been good over a number of years, and who had a theatre equally located and considerably larger than the Penn Theatre, and which promised greater revenue, while the Penn Theatre was to be operated by a stranger in Ambridge whose ability and credit was unknown. Neither Loew's R. K. O., nor Twentieth Century-Fox, in their respective decisions to license the State Theatre were influenced by Paramount Pictures, Inc., or its power in the moving picture industry.

35. Paramount Film, Loew's R. K. O., and Twentieth Century-Fox each offered the plaintiff runs subsequent to the first runs upon terms to be subsequently agreed upon, but plaintiff refused all except first runs.

36. Plaintiff requested Paramount Film to license the Penn Theatre for exhibition of first runs for the first time on May 4, 1944. It first requested Loew's to license it for first runs on January 5, 1944, R. K. O., on March 30, 1944, and Twentieth Century Fox on March 30, 1944. Prior to each of said dates Pennware had requested said first runs for its theatre.

37. While Paramount Pictures owns an interest in various theatres and theatre corporations, it does not operate the theatres in which it has an interest. Each local theatre corporation in which Paramount Pictures has an interest, employs an experienced theatre operator under a management contract. Such local manager has full charge and responsibility of the operation of the theatre. He determines the policies and admission prices, negotiates with various distributors for the

licensing to him of motion pictures, while Paramount reserves the right to pass upon unusual capital expenditures and the leasing and purchasing of theatre properties. This is also true in the case of Pennware, and Notopoulos and his sons alone negotiated the licensing to it of motion pictures for both the Penn and the State Theatres. Paramount played no part in such negotiations and never communicated with any representative of any distributor regarding the motion pictures that were to be exhibited in either the Penn or the State Theatres.

### Conclusions of Law.

I. Each of the defendants R. K. O., Loew's, Twentieth Century-Fox and Paramount Film lawfully contracted and may contract with the defendant Pennware for the exhibition of its pictures first run at the State Theatre in Ambridge.

II. No one of the defendants R. K. O., Loew's, Twentieth Century-Fox and Paramount Film has been or is under any duty to license the plaintiff for the exhibition of its pictures first run in Ambridge.

III. When a long-time exhibitor-customer of a distributor acquires a new and larger theatre, with at least as good a location as his former and smaller theatre, no distributor is under any obligation to abandon such a customer in favor of a stranger who takes over the operation of the smaller theatre.

IV. Each of the defendants R.K.O., Loew's, Twentieth Century-Fox and Paramount Film acting independently of the others had and has the right to choose its own customer and the theatre in which its pictures are to be exhibited first run.

V. There was no contract, combination, or conspiracy in restraint of trade or commerce between or among the defendants or any two or more of them.

VI. None of the defendants monopolized, or attempted to monopolize, or combined or conspired with any other defendant or defendants to monopolize any part of trade or commerce.

VII. There is no evidence that any of the defendants Paramount, R. K. O., Loew's or Twenty Century-Fox, acquired, directly or indirectly, any of the stock of Pennware in violation of the Act of October 15, 1914, c. 323 § 7, 15 U.S.C.A. § 18.

VIII. The complaint should be dismissed and plaintiff should pay the defendants their costs.